# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID J. HARMAN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )  Case No. 1:18-cv-01695-TWP-MPB |
| | ) |
| DUSHAN ZATECKY Warden, | ) |
| | ) |
| Respondent. | ) |

## ORDER DENYING PETITION FOR A WRIT OF HABEAS CORUPUS

Petitioner David J. Harman was convicted of attempted murder in an Indiana state court.

Mr. Harman now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mr. Harman raises

numerous instances of alleged trial and appellate counsel ineffectiveness in addition to an alleged

due process error when the trial court denied his counsel the opportunity to make an offer of proof.

The Court finds that none of Mr. Harman's claims entitle him to relief. Therefore, his Petition for

a Writ of Habeas Corpus (Dkt. 2) is **denied** and a certificate of appealability will not issue.

## I. BACKGROUND

Federal habeas review requires the Court to "presume that the state court's factual

determinations are correct unless the petitioner rebuts the presumption by clear and convincing

evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018); *see* 28 U.S.C.

§ 2254(e)(1). On direct appeal, the Indiana Court of Appeals summarized the relevant facts and

procedural history as follows:

> In May 2011, Harman, who was nicknamed "Red," was dating Cathy Jenkins
> ("Cathy"), who had previously been married to J.R. Jenkins ("Jenkins"). Jenkins
> and Cathy, who divorced in 2007, had two sons, Joe and A. Jenkins, lived on
> Oakdale Avenue in Hammond, Indiana, and A. lived with him. Cathy and Joe lived
> with Cathy's mother in Illinois. At times, Cathy stayed with Harman, who lived
> with his mother in Illinois. Cathy and Harman also stayed sometimes with Cathy's
> friend, Lori Jones ("Jones"), and Jones's fiancé, Kevin Hanshew ("Hanshew"), who

lived in Highland, Indiana.

On May 31, 2011, Harman was doing yard work for Hanshew and Jones at their house in Highland. That afternoon, while Jones was out running an errand, Harman asked Hanshew to drive him to Hammond. Harman directed Hanshew on where to drive and had him park in an alley near Jenkins's house. Harman told Hanshew that he would be gone "a couple of minutes." (Tr. 135). Hanshew waited twenty minutes and then left because he was hot.

During this time, Harman went to Jenkins's house and asked to speak to him about Jenkins's older son, Joe. Jenkins invited Harman in, and they sat at the kitchen table. As they were talking, forty-seven- year-old Harman "sprung out with his left hand" and hit seventy- seven-year-old Jenkins in the face, knocking off Jenkins's glasses and toupee. (Tr. 313). Harman then started "beating" Jenkins. (Tr. 313). As Jenkins was "slumped down ... against the wall and the table," Harman "busted" a "heavy duty" wooden chair over Jenkins. (Tr. 314). When Jenkins tried to get off the ground, Harman repeated, "lay there and die, you son of a bitch, you're dead, you're dead" and "[l]ay there and die, you son of a bitch, you're worth more to us dead than you are alive." (Tr. 314). Harman continued to hit and kick Jenkins. Then, as Jenkins was trying to get up, Harman "slic[ed]" Jenkins's throat with some sort of sharp object. (Tr. 315). Harman cut Jenkins's throat with such force that he cut "through skin, muscle and into [his] thyroid cartilage." (Tr. 92). As Harman cut him, Jenkins asked Harman, "Red what the F are you doing[?]" (Tr. 315). Jenkins saw that his "blood was shooting everywhere" and heard Harman repeating, "you're dead, you son of a bitch, lay there and die." (Tr. 315). Jenkins then lost consciousness.

Thereafter, Harman called Hanshew, who was "almost halfway home" to Highland, and asked Hanshew to pick him up. (Tr. 137). As Hanshew drove on Oakdale Avenue, Hanshew saw Harman "beating and kicking" an older man on a porch. (Tr. 138). When Hanshew saw that the man being beat had "blood all over" him, Hanshew kept driving and returned to his house. (Tr. 139). Harman then called Jones, yelling that Hanshew had left him, and asked her to pick him up in Hammond. After Jones dropped Harman back at the house, he took a shower, washed his clothes, and threw away his boots.

Meanwhile, Jenkins regained consciousness and was able to get up and eventually make his way to the house of Janet (a/k/a Jackie) Jenkins ("Jackie"), who lived a few houses down from him. When Jenkins went in Jackie's house, he was weak and "his neck was bleeding profusely." (Tr. 416). Jackie sat him on the sofa, put a towel on his neck, and called the paramedics. When Jackie asked Jenkins who had hurt him, he responded, "Red, Cathy's boyfriend[.]" (Tr. 317). Jenkins then lost consciousness due to his blood loss.

Later in the evening, Cathy arrived at Jenkins's house to drop off A. When she arrived, she saw the police and police tape around Jenkins's house. Cathy then went to the police station to speak to the police. Thereafter, Cathy called Jones to tell her

that she would be delayed in getting to Jones's house and informed Jones about what happened at Jenkins's house with the police. After Jones got off the phone, she went into the bedroom where Harman was sleeping, hit him on his feet, and asked "what did you do[?]" (Tr. 236). Harman responded, "I kicked the shit out of him, I should've fucking killed him." (Tr. 236).

Jenkins was initially taken to a local hospital but was then airlifted to a hospital in Illinois due to the traumatic nature of his injuries. Jenkins suffered a subdural hematoma, a neck fracture, and an "extremely large and deep neck wound." (Tr. 75). Jenkins's neck wound stretched "clear across his neck" and was so deep that his trachea was cut. (Tr. 79). Jenkins's neck laceration was so "extensive" that the trauma surgeon described it as "filleted." (Tr. 79). Jenkins's injuries caused him to undergo a "traumatic arrest" where his loss of a large amount of blood caused his heart to stop. (Tr. 76). Jenkins spent a total of approximately two months in the hospital due to his injuries and complications from them. For a time, Jenkins was unable to talk and had to have a tracheostomy tube and a feeding tube.

On June 7, 2011, police officers went to the hospital to interview Jenkins. Jenkins, who was unable to speak because of his tubes, identified Harman as the perpetrator of the crime against him by writing the name "Red" on a piece of paper. Thereafter, the State charged Harman with Count I, Class A felony attempted murder; Count II, Class B felony aggravated battery; and Count III, Class C felony battery.

The trial court held a five-day jury trial from January 28, 2013 to February 1, 2013. Prior to trial, the State filed a motion in limine, seeking to exclude evidence of Jenkins's prior convictions, arrests, and charges pursuant to Evidence Rules 401, 404(b), 608, and 609. Specifically, the State sought to preclude evidence regarding: (1) Jenkins's convictions, in Illinois in September 1979, for conspiracy to commit murder, solicitation to commit murder, and attempted murder; and (2) Jenkins's guilty plea, "sometime prior" to May 2011, to threatening Cathy on the telephone in violation of a protective order issued by an Illinois court against him and in favor of Cathy. (App. 73).

Prior to the presentation of witnesses, the trial court heard argument regarding the State's motion in limine. The State argued that the prior convictions and the protective order, which was issued as part of Jenkins and Cathy's dissolution, were not relevant and would confuse the issues at trial. Harman's counsel stated that he was not planning on introducing any evidence regarding Jenkins's 1979 criminal convictions "due to the remoteness in time" but argued that Jenkins's violation of the protective order protecting his ex-wife Cathy was "extremely relevant" because Harman was dating Cathy. (Tr. 19). The trial court granted the State's motion in limine to exclude evidence of the prior convictions and the protective order.

...

Harman's defense at trial focused on identification, with him contending that there

was no "scientific evidence" to link Harman to the crime. (Tr. 71). During trial, prior to cross-examining Jenkins, Harman renewed his objection to the trial court's pre-trial limine ruling that he was precluded from presenting evidence regarding Jenkins's violation of the protective order entered in favor of Cathy. Also, as part of an offer to prove, he sought to introduce a police report on the protective order violation. Harman did not renew his objection or make an offer to prove regarding the trial court's pre-trial limine ruling that he could not present evidence regarding Jenkins's 1979 convictions.

The jury found Harman guilty as charged. At sentencing, the trial court determined that there were no mitigating circumstances. The trial court found the following to be aggravating circumstances: (1) the injury suffered by the victim was greater than the elements necessary to prove the crime; (2) Harman's criminal history; (3) the age of the victim being over sixty-five years of age; (4) the nature and circumstances of the "brutal" attack against the victim; (5) Harman possessed "a violent and depraved nature[;]" and (6) Harman's lack of remorse. (App. 90). The trial court merged Counts II and III into Count I due to double jeopardy concerns, entered judgment of conviction on the attempted murder conviction only, and imposed a forty-five (45) year sentence in the Department of Correction.

*Harman v. State*, 4 N.E.3d 209, 212-15 (Ind. Ct. App. 2014) ("*Harman I*").

Mr. Harman was represented by Adam Tavitas at trial and by Mark Smalls on direct appeal. Mr. Harman exhausted one claim on direct appeal—that the trial court violated Mr. Harman's right to due process by not letting him make an offer to prove that Jenkins violated Cathy's protective order. The Indiana Court of Appeals found the issue waived because it was not raised at trial and that the trial court had allowed Mr. Harman to make an offer of proof. *Harman I*, 4 N.E.3d at 215-17 & n.6. The Indiana Supreme Court denied Mr. Harman's petition to transfer. (Dkt. 7-2.)

Mr. Harman's petition for post-conviction relief was denied on July 7, 2018. (Dkt. 7-8.) On appeal, he raised three grounds for relief. First, he argued that the post-conviction court erred when it failed to subpoena witnesses. Second, he raised fourteen instances of deficient performance by his trial counsel. Third, he raised seven instances of deficient performance by his appellate counsel. (Dkt. 7-10.) The Indiana Court of Appeals affirmed the post-conviction court

on all grounds. *Harman v. State*, 2018 WL 1278769 (Ind. Ct. App. 2018) ("*Harman II*"). Mr. Harman's petition to transfer to the Indiana Supreme Court was denied.[1] (Dkt. 7-9.)

Mr. Harman filed the instant Petition for Writ of Habeas Corpus on June 5, 2018. In it, he raises the following grounds for relief:

1. Due process error when the trial court failed to allow his counsel to make an offer of proof.

2. Ineffective assistance of trial counsel:

   a. not investigating Jenkins's criminal history, a protective order, and an anonymous phone call;
   b. not calling character witnesses;
   c. not objecting to the battery charges;
   d. making a comment at the motion in limine hearing;
   e. not calling Harman as a witness;
   f. eliciting testimony from Jenkins;
   g. not presenting expert witnesses;
   h. not moving to exclude the voicemail message recording;
   i. not objecting to leading questions and hearsay;
   j. not objecting to an excited utterance;
   k. not objecting to the note that Jenkins wrote in the hospital;
   l. not objecting to a juror question;
   m. not objecting to prosecutorial misconduct; and
   n. not protecting Harman from a civil conspiracy.

3. Ineffective assistance of appellate counsel:

   a. inadequately challenging Harman's sentence;
   b. not raising ineffective assistance of trial counsel;
   c. not challenging evidence under the best evidence rule;
   d. not raising leading questions or hearsay;
   e. not challenging an excited utterance;
   f. not challenging the battery charges; and
   g. not raising prosecutorial misconduct.

---

[1] Although the respondent argues that Mr. Harman's ineffective assistance of appellate counsel claim was waived when he failed to fairly present it in his petition to transfer, the Court will address the merits of this claim and bypass the issue of procedural default. *See Washington v. Boughton*, 884 F.3d 692, 698 (7th Cir. 2018) (explaining why bypassing a question of procedural default to deny a claim on the merits is "consistent with the interests of comity, finality, federalism, and judicial efficiency that are at the heart of both the exhaustion requirement and the procedural default doctrine"); *see also Brown v. Watters*, 599 F.3d 602, 610 (7th Cir. 2010) (concluding that it is appropriate to bypass a "difficult" procedural default question and "proceed to adjudicate the merits" when it is "clear" the petition should be denied on the merits).

Dkt. 7-10.

## II. <u>APPLICABLE LAW</u>

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") directs how the Court must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state court's adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (citation and quotation marks omitted). "This

is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "The bounds of a reasonable application depend on the nature of the relevant rule. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (citation and quotation marks omitted).

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). For a petitioner to establish that "counsel's assistance was so defective as to require reversal," he must make two showings: (1) that counsel rendered deficient performance that (2) prejudiced the petitioner. *Id.* "This inquiry into a lawyer's performance and its effects turns on the facts of the particular case, which must be viewed as of the time of counsel's conduct." *Laux v. Zatecky*, 890 F.3d 666, 673-74 (7th Cir. 2018)

(citation and quotation marks omitted). "As for the performance prong, because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight, *Strickland* directs courts to adopt a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 674 (citation and quotation marks omitted). "The prejudice prong requires the defendant or petitioner to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

## III.  DISCUSSION

### A.    Due Process Claim

Mr. Harman argues that the trial court violated his due process rights when it denied him an opportunity to make an offer of proof. The Indiana Court of Appeals determined that Mr. Harman had waived this claim because he did not raise it in the trial court. *Harman I*, 4 N.E.3d at 215, n.6.  In Indiana, an appellant may not raise a constitutional evidentiary challenge for the first time on appeal. *See, e.g.*, *McCallister v. State*, 91 N.E.3d 554, 563 (Ind. 2018).

A federal "[c]ourt will not review a question of federal law decided by a state court if the decision rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted).  The Indiana Court of Appeals' determination that the claim was waived constitutes an  independent and adequate state law ground that prevents this Court from reviewing the claim unless Mr. Harman "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  Mr. Harman does not acknowledge his

procedural default or offer a reason to excuse it. He is therefore not entitled to relief on this ground.

Furthermore, although the trial court did not admit the exhibit trial counsel wanted to rely on for his offer of proof, the trial court did mark the exhibit as "offered and refused" so that it would be part of the record on appeal. Trial Tr. 358-359.

**B.      Ineffective Assistance of Trial Counsel Claim**

Mr. Harman argues that he received ineffective assistance of trial counsel. In support of his claim he points to fourteen separate instances of deficient performance. The Indiana Court of Appeals held that none of these instances were deficient performance. *Harman II,* 2018 WL 1278769 at \*15.

**1.      Inadequate Investigation**

Mr. Harman argues that his counsel performed deficiently when he failed to investigate the victim's criminal history, a protective order, and an anonymous telephone call. The Indiana Court of Appeals reasonably concluded that trial counsel was not ineffective in this regard, both because he did in fact investigate these things and because none of them would have changed the outcome of the trial. The trial record supports the Indiana Court of Appeals' conclusion.

Mr. Harman's counsel investigated the victim's criminal history and correctly concluded that the 1979 convictions were too old to be used to impeach the victim's testimony. Trial Tr. 18-19; Ind. Evidence Rule 609(b). He also investigated the protective order and argued for its admission at trial but lost. Trial Tr. 19, 24, 341-42, 352-59. Mr. Harman argues that the protective order, and the victim's violation of it, would have established the victim's propensity for violence and that the victim was the initial aggressor. But the state court held that the protective order was inadmissible for these purposes based on the Indiana Rules of Evidence.

As for the anonymous 911 call that Mr. Harman believes was made by Mr. Hanshew,

Mr. Harman's trial counsel reviewed the police report documenting the call. When asked on cross-examination whether he had called the police, Mr. Hanshew denied doing so.

Even if he had somehow been able to show that Mr. Hanshew had placed the call, it would have impeached Mr. Hanshew's testimony on a minor point—that he had not called police. But Mr. Harman argues that proving that Mr. Hanshew placed the 911 call would have done much more by implicating Mr. Hanshew in the crime.

In the 911 call, the anonymous male caller stated that "Red" threw the knife used in the crime out of the car by the 175th Street expressway ramp. Mr. Hanshew testified at trial that he pulled over near the 175th Street expressway ramp to listen to his voicemails from Mr. Harman on the day of the crime. Mr. Harman argues that this consistency of location demonstrates that Mr. Hanshew made the 911 call to "take the focus off of himself and on to Harman." (Dkt. 11, p. 8.) He further argues that unidentified fingerprints and male DNA were found at the scene, and that together, this evidence could have been used to prove that Mr. Hanshew beat the victim, rather than Mr. Harman.

At the state post-conviction hearing, Mr. Harman's trial counsel testified that he did not pursue this angle because he believed that identifying the anonymous caller would lead to additional "very bad evidence against [Mr. Harman]". PCR Trans. 22. The Indiana Court of Appeals reasonably applied the *Strickland* standard to conclude that trial counsel's strategic decision not to further investigate the anonymous 911 call was reasonable. *See Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003) (trial counsel's investigation is reviewed for reasonableness considering the circumstances of the particular case). Although Mr. Harman may have believed that proving that Mr. Hanshew placed the 911 call would have been good for his defense, his attorney's reasonable professional judgment was that it was not worth the limited resources he had before trial to further develop a line of defense that was not promising.

In short, it was reasonable for the Indiana Court of Appeals to determine that trial counsel's investigation of the victim's criminal record, the protective order, and the anonymous 911 caller was reasonable and not deficient performance.

### 2.    Failing to Call Character Witnesses

Mr. Harman argues that his trial counsel was ineffective because he failed to interview, subpoena, and elicit testimony from character witnesses who would have contradicted the prosecution's characterization of him as an "outlaw biker." (Dkt. 11, p. 9.)  At the post-conviction hearing, trial counsel testified that whether to call character witnesses is a strategic decision because it can open the door to evidence of the defendant's prior criminal convictions.  PCR Tr. 16-17. The Indiana Court of Appeals held that choosing not to call character witnesses in Mr. Harman's case was reasonable because Mr. Harman had a criminal history.  *Harman II,* 2018 WL 1278769 at *7.  This determination was a reasonable application of *Strickland*.

### 3.    Failing to Object to Battery Charges

Mr. Harman next argues that his trial counsel was ineffective because he failed to object to battery charges that violated the prohibition against double jeopardy. The Indiana Court of appeals rejected this argument because, under state law, prosecutors are free to bring repetitive charges so long as the trial court does not enter judgment on the lesser charge or charges when a jury convicts on overlapping charges.  *Id*. Here, the trial court only entered a judgment of conviction for attempted murder against Mr. Harman.  Trial Tr. 909.  Because the trial court would not have sustained an objection to the battery charges, the Indiana Court of Appeals held that Mr. Harman's trial counsel was not deficient for failing to raise the objection.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Wilson v. Corcoran*, 526 U.S. 1, 5 (2010) (citation and quotation marks omitted); *see Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016) ("A federal court cannot disagree

with a state court's resolution of an issue of state law."). Such is true even when, as here, it is embedded in an ineffective assistance of counsel claim. "Although claims of ineffective assistance of counsel can be premised on an attorney's failure to raise state-law issues, federal courts reviewing such claims must defer to state-court precedent concerning the questions of state law underlying the defendant's ineffectiveness claim." *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (citations omitted); *see Harper v. Brown*, 865 F.3d 857, 859 (7th Cir. 2017) (holding that a habeas petitioner's argument was really an attack on a state court's resolution of a question of state law embedded within its analysis of a *Strickland* claim and that federal courts are not empowered to review such questions of state law under § 2254). Because the Indiana Court of Appeals' decision regarding this instance of claimed deficient performance rests on state law grounds, this Court will not review it.

### 4.    <u>Counsel's Prejudicial Remarks</u>

Mr. Harman alleges that his counsel performed deficiently during the motion *in limine* hearing when, while arguing for the admission of the protective order, he said, "I believe Mr. Harman would even testify that he believes that ... Cathy Jenkins [Mr. Harman's girlfriend] ... may have actually had some part in putting Mr. Harman up to this crime." Trial Tr. 21. The Indiana Court of Appeals reasonably applied *Strickland* when it held that this was not deficient performance by Mr. Harman's counsel. The Indiana Court of Appeals reasoned that it was clear from the context of the trial transcript that Mr. Harman's counsel misspoke when he said Mr. Harman would testify that he believed his girlfriend put him up to the crime. Instead, his counsel meant that the victim, Mr. Jenkins, would testify that he believed his ex-wife put Mr. Harman up to the crime. Mr. Harman's counsel made this clear during the hearing on the motion *in limine*. Trial Tr. 24. The Indiana Court of Appeals further noted that the comment was not made in front of the jury and therefore did not prejudice Mr. Harman's defense. *Harman II,*

2018 WL 1278769 at *8.  This conclusion, too, was reasonable.

## 5.      Failing to Call Mr. Harman to Testify

Mr. Harman argues that his counsel performed deficiently when he counseled Mr. Harman not to testify in his own defense at trial.  He further argues that his trial counsel put on contradictory defenses of self-defense and reasonable doubt, but that he only wanted to present a defense that someone else committed the crime.  His trial counsel testified at the post-conviction hearing that he was pursuing a reasonable doubt defense, rather than self-defense. PCR Tr. 33. Mr. Harman does not point to any evidence in the record that his counsel pursued a self-defense theory at trial or that he pursued contradictory theories of defense.

The Indiana Court of Appeals held that trial counsel put on a consistent defense of reasonable doubt and was not ineffective for counseling Mr. Harman not to testify.  The trial record supports the Indiana Court of Appeals decision.  Out of the presence of the jury, the trial judge made a record that Mr. Harman had the right to testify and that Mr. Harman was choosing not to testify.  Trial Tr. 794-95. At that time, his trial counsel noted that he had discussed with Mr. Harman that Mr. Harman could "trump" his attorney's advice and chose to testify if he wished to.  *Id*. at 795-96.  The Indiana Court of Appeals' decision on this issue was a reasonable application of S*trickland*.

## 6.      Eliciting Harmful Testimony from Mr. Jenkins

Mr. Harman argues that his counsel performed deficiently when he elicited harmful testimony from the victim that provided a motive for Mr. Harman to have committed the crime.  On direct examination, Mr. Jenkins testified that as Mr. Harman was beating him, Mr. Harman said "Lay there and die, you son of a bitch, you're worth more to us dead than you are alive."  Trial Tr. 314.  The Court had previously granted a motion *in limine* to exclude any evidence regarding Mr. Jenkins' life insurance policy which listed his sons as beneficiaries. When Mr. Harman's

counsel's questioning on cross-examination approached the point of asking Mr. Jenkins about Mr. Harman's comment, the judge held a side bar and allowed defense counsel to ask Mr. Jenkins what Mr. Jenkins thought Mr. Harman had meant by his comment. Trial Tr. 373-76. Mr. Jenkins responded that he thought Mr. Harman would benefit from Mr. Jenkins' death because proceeds from Mr. Jenkins' life insurance policies would go to his sons, who were in the custody of his ex-wife, Mr. Harman's girlfriend. *Id*. at 378. The judge again held a side bar and cautioned Mr. Harman's counsel that he may not want to continue with the line of questioning because it provided a motive for Mr. Harman. Counsel indicated that he wanted to clarify that Mr. Jenkins' ex-wife was not the beneficiary of the life insurance policy to combat the idea planted by Mr. Jenkins' statement that Mr. Harman had said Mr. Jenkins was worth more to them dead than alive. *Id*. 380-81.

The Indiana Court of Appeals held that Mr. Harman's counsel did not perform deficiently by eliciting the insurance policy testimony from Mr. Jenkins. Instead, he was attempting to rebut the inference created by Mr. Jenkins' earlier testimony that Mr. Harman had a financial motive to kill Mr. Jenkins by showing both that Mr. Harman would not have benefitted from Mr. Jenkins' life insurance policy because Mr. Harman's girlfriend was not a beneficiary, and that the life insurance policy may have created motive for someone else to have tried to kill Mr. Jenkins. *Harman II*, 2018 WL 1278769 at *10. Counsel testified at the post-conviction hearing that he was trying to show that Mr. Harman did not have a financial motive to kill Mr. Jenkins and "that whoever the policy would go to, could be a motive for someone else to commit the crime, for someone else to want the alleged victim killed." PCR Tr. 45. Because the policy was not for Mr. Harman's girlfriend, "why in the world would he do that? She's not getting the money. So, it could be someone else could have perhaps done the crime, other than Mr. Harman." *Id*. at 48. And during closing argument, Mr. Harman's counsel reminded the jury that Mr. Jenkins and his ex-

wife had been divorced for at least three years, noted that the insurance policy was for Mr. Jenkins' sons, and argued that the policy would not benefit his ex-wife. Trial Tr. 859–60.

While the testimony elicited on cross-examination may have strengthened rather than weakened the inference of financial motive, counsel's performance is entitled to "doubly deferential" review. *Richter*, 562 U.S. at 105. The state court applied the first level of deference by deciding only whether counsel's performance was reasonable, not whether it was optimal. *Id.* at 111 ("[T]here is no expectation that competent counsel will be a flawless strategist or tactician, [and] an attorney may not be faulted for a reasonable miscalculation."). This Court then applies a second level of deference by deciding only whether the state court's decision was reasonable, not whether it was right. *Dassey*, 877 F.3d at 302 ("Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement.'" (quoting *Richter*, 562 U.S. at 103)). The Indiana Court of Appeals concluded that counsel's misstep — if it was one — was a reasonable strategic decision. *Harman II*, 2018 WL 1278769 at *10. The state court's assessment of counsel's performance was not so lacking in justification that it was an error beyond any possibility of fairminded disagreement.

### 7. Failing to Present Expert Testimony

Mr. Harman argues that his counsel performed deficiently when he failed to consult or present expert witnesses for three purposes: 1) to challenge the reliability of the voice-mail recording, 2) to test hair found on a cell phone at the crime scene, and 3) to challenge the reliability of Mr. Jenkins' hospital identification of Mr. Harman as his attacker.

Mr. Harman argues that the video recording of the cell phone playing a voice message was difficult for the jury to hear. He contends that an expert could have challenged the reliability of this evidence. The Indiana Court of Appeals held that Mr. Harman's counsel was not ineffective

for failing to call an expert to challenge the reliability of the recording because Mr. Harman did not explain how an expert could have challenged the recording's reliability. Both Mr. Hanshew and Mr. Harman's girlfriend identified the voice on the recording as Mr. Harman. Trial Tr. 168; 690-691. The mere fact that the jury heard the voice mail recording through a video recording of the cell phone does not render the recording unreliable.

As for the hair sample, the Indiana Court of Appeals stated that Mr. Harman's assertion that the hair was likely exculpatory was "speculative at best." *Harman II,* 2018 WL 1278769 at *11. The Indiana Court of Appeals went on to state that even if it had been deficient performance to fail to get an expert to test the hair, Mr. Harman was not prejudiced by the failure because the evidence against him was overwhelming.

Finally, the Indiana Court of Appeals held that Mr. Harman's trial counsel did not perform deficiently when he failed to seek expert testimony to challenge testimony from a detective that Mr. Jenkins mouthed the word "Red" when asked who attacked him. Trial Tr. 730. Mr. Harman contends that an expert could have determined whether, considering Mr. Jenkins' injuries, Mr. Jenkins was capable of making an identification at that time. The Indiana Court of Appeals held that the testimony was merely cumulative of Mr. Jenkins' identification of Mr. Harman immediately after the attack and at trial. *Harman II,* 2018 WL 1278769 at *11. The Indiana Court of Appeals reasonably applied *Strickland* in determining that Mr. Harman's counsel did not perform deficiently when he failed to consult with experts or present expert testimony at trial.

### 8.     Failing to Exclude the Voicemail Recording

Mr. Harman argues that his counsel performed deficiently when he failed to object to the admission of his voicemail to Mr. Hanshew. Both Mr. Hanshew and Mr. Harman's girlfriend identified the voice on the recording as Mr. Harman. Trial Tr. 168; 690-691. The Indiana Court of Appeals held that the recording was admissible under Indiana evidentiary rules as a duplicate

of the original recording. Again, this state law determination is unreviewable by this federal habeas court. *See Wilson*, 131 S. Ct. at 16; *Miller*, 820 F.3d at 277. Such is true even when, as here, it is embedded in an ineffective assistance of counsel claim. *See Harper*, 865 F.3d at 859; *Shaw*, 721 F.3d at 914.

### 9. Failing to Object to Leading Questions and Hearsay

Mr. Harman argues that his trial counsel performed deficiently when he failed to object to leading questions and hearsay. The Indiana Court of Appeals held that Mr. Harman waived this claim by failing to support it with cogent reasoning, but the court nevertheless addressed the merits of the claim by holding that counsel made a reasonable strategic decision not to object to leading questions or hearsay statements that he did not think would harm his client. *Harman II,* 2018 WL 1278769 at *12. Trial counsel's strategic decision is "virtually unchallengable" when, as here, there is no allegation that the strategy was based on a failure to investigate. *Strickland*, 466 U.S. at 691. The Indiana Court of Appeals' decision on this issue was not unreasonable.

### 10. Failing to Object to an Excited Utterance

Mr. Harman contends that his trial counsel performed deficiently when he failed to object to testimony that Mr. Jenkins had identified Mr. Harman as his attacker shortly after he was attacked. His counsel's hearsay objection to the testimony was overruled on the grounds that the out-of-court statement by Mr. Jenkins was an excited utterance. Mr. Harman argues that his counsel should have objected on the basis that it occurred too remotely in time from the attack to be considered an excited utterance. The evidence showed that Mr. Jenkins lost consciousness during the attack. When he regained consciousness, he stumbled to a neighbor's house four doors down from him and told her that he had been attacked by Mr. Harman. The Indiana Court of Appeals held that the statement was admissible under Indiana's rules of evidence. This state law determination is unreviewable by this Court. *See Wilson*, 131 S. Ct. at 16; *Miller*, 820 F.3d at 277.

### 11. Failing to Object to Mr. Jenkins' Hospital Note

Mr. Harman contends that his trial counsel performed deficiently when he failed to object to a note written by Mr. Jenkins in the hospital which identified his attacker as "Red". Mr. Harman argues that the photocopy of the note should not have been admitted under Indiana's "best evidence" rule, but the Indiana Court of Appeals concluded that admission of the photocopied note was not error. As stated above, this state law determination is unreviewable by this Court. *See Wilson*, 131 S. Ct. at 16; *Miller*, 820 F.3d at 277.

### 12. Failing to Object to a Juror Question

Mr. Harman argues that his trial counsel performed deficiently when he failed to object to a juror's question to Mr. Harman's ex-wife about where they met. Mr. Harman contends that her answer, that they met in a bar, was irrelevant and prejudicial. The Indiana Court of Appeals held that the question was not improper, that it could have reasonably assisted the jury in developing an understanding of the factual background of the case, and that Mr. Harman was not prejudiced by the answer. *Harman II,* 2018 WL 1278769 at *13. The court's conclusion that the jury question was not objectionable rests on state law, making it unreviewable by this Court. *See Wilson*, 131 S. Ct. at 16; *Miller*, 820 F.3d at 277.

### 13. Failing to Object to Prosecutorial Misconduct

Mr. Harman argues that his trial counsel performed deficiently when he failed to object to the prosecutor asking a witness if Mr. Harman carried a knife, asking another witness if Mr. Harman owned a motorcycle and what kind, and admitting Mr. Harman's booking photo into evidence. The Indiana Court of Appeals held that each of these pieces of evidence was admissible. A determination of state evidentiary law is not reviewable by this Court. *See Wilson*, 131 S. Ct. at 16; *Miller*, 820 F.3d at 277.

### 14.     <u>Failing to Protect Mr. Harman from a Civil Conspiracy</u>

Mr. Harman argues that his trial counsel performed deficiently when he failed to object to a civil conspiracy perpetrated against him by the prosecutor, investigating officers, and witnesses at trial. Mr. Harman relies on 42 U.S.C. § 1985's definition of a civil rights conspiracy. The Indiana Court of Appeals held that Mr. Harman failed to prove any conspiracy against him and that, even if he had proven the existence of a conspiracy, his remedy would be a civil case for damages rather than any change in his criminal conviction or sentence. *Harman II,* 2018 WL 1278769 at *15. The state court's conclusion was not unreasonable.

### C.     <u>Ineffective Assistance of Appellate Counsel Claim</u>

Mr. Harman argues that he received ineffective assistance of appellate counsel. In support of his claim, he points to seven separate instances of deficient performance. The Indiana Court of Appeals held that none of these instances were deficient performance. The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). A petitioner who contends that appellate counsel rendered ineffective assistance must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced petitioner in the sense that there is a reasonable probability that his case would have been remanded for a new trial or that the decision of the state trial court would have been otherwise modified on appeal. *Howard v. Gramley*, 225 F.3d 784, 790 (7th Cir. 2000).

### 1.     <u>Failing to Adequately Challenge the Sentence</u>

Mr. Harman argues that his appellate counsel performed deficiently when he failed to adequately argue that his prior military service and limited criminal history should be considered mitigating factors. The Indiana Court of Appeals reasonably held that appellate counsel had adequately raised these issues and that Mr. Harman had not shown how his appellate counsel could

have argued them better.

## 2. Failing to Raise Ineffective Assistance of Trial Counsel

Mr. Harman argues that his appellate counsel performed deficiently when he failed to raise ineffective assistance of trial counsel on appeal. The Indiana Court of Appeals held that this decision was strategic and reasonable because it is preferable that ineffective assistance of counsel claims be brought in post-conviction relief proceedings rather than on direct appeal. The Indiana Court of Appeals' decision was reasonable in this regard.

## 3. Remaining Instances of Alleged Appellate Ineffectiveness

The remaining five instances of deficient performance by appellate counsel—1) not challenging evidence under the best evidence rule, 2) not raising leading questions or hearsay, 3) not challenging an excited utterance, 4) not challenging the battery charges, and 5) not raising prosecutorial misconduct—were also raised by Mr. Harman as instances of trial counsel's deficient performance. The Indiana Court of Appeals rejected each instance of alleged appellate counsel deficient performance for the same reasons it rejected the corresponding allegation of trial counsel deficient performance. The Indiana Court of Appeals reasonably applied *Strickland* in holding that appellate counsel was not ineffective for failing to raise losing issues on appeal. Furthermore, all of these issues were decided by the Indiana Court of Appeals on state law grounds which are not reviewable by this Court. He is therefore not entitled to habeas relief and his petition is **denied**.

## IV. CERTIFICATE OF APPEALABILITY

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts

requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Put differently, the petitioner must show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 137 S. Ct. at 773 (citation and quotation marks omitted).

Where, as here, some claims (or allegations of deficient performance) are rejected on procedural grounds, the petitioner must show both that a reasonable jurist could disagree with the district court's resolution of the procedural question and that a reasonable jurist could resolve the constitutional question in the petitioner's favor.

Here, reasonable jurists would not dispute that the due process claim is procedurally defaulted because Mr. Harman failed to raise it through one complete round of the ordinary state appellate process. And reasonable jurists would not dispute that the ineffective assistance of counsel claims are without merit, barred by § 2254(d), or both. Therefore, a certificate of appealability is **denied**.

## V.  CONCLUSION

Mr. Harman's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Dkt. [2]) is **DENIED** and a certificate of appealability shall not issue.

Final Judgment in accordance with this decision shall issue.

**SO ORDERED.**

Date:  7/15/2019

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

21

DISTRIBUTION:

David J. Harman, #231831
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Jesse R. Drum
INDIANA ATTORNEY GENERAL'S OFFICE
jesse.drum@atg.in.gov